**IN THE DISTRICT COURT OF THE UNITED STATES**
**FOR THE WESTERN DISTRICT OF NORTH CAROLINA**
**CHARLOTTE DIVISION**
**CIVIL CASE NO. 3:06cv43**

| | |
|---|---|
| **DAVID T. WILSON,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | **MEMORANDUM OF** |
| **vs.** ) | **DECISION AND ORDER** |
| ) | |
| **MICHAEL J. ASTRUE,**[1] ) | |
| **Commissioner of Social Security,** ) | |
| ) | |
| **Defendant.** ) | |
| ) | |
| _____ ) | |

**THIS MATTER** is before the Court on the Plaintiff's Motion for Summary

Judgment [Doc. 18] and the Defendant's Motion for Summary Judgment [Doc.

20].

## I.   PROCEDURAL HISTORY

The Plaintiff David T. Wilson filed applications for a period of disability,

disability insurance benefits, and supplemental security income benefits on

February 4 and 11, 2002, alleging that he had become unable to work as of

---

[1]Michael J. Astrue replaced Jo Anne B. Barnhart as Commissioner of the Social Security Administration on February 12, 2007.  Accordingly, Michael J. Astrue is hereby substituted as the official-capacity defendant in this matter.  See Fed. R. Civ. P. 25(d).

November 3, 2001. [Transcript ("Tr.") 24, 95-97, 212]. The Plaintiff's application was denied initially and on reconsideration [Tr. 79-88], and he requested a hearing, which was held on April 14, 2004. [Tr. 34-76]. On April 29, 2004, the Administrate Law Judge (ALJ) rendered a decision denying the Plaintiff benefits. [Tr. 21-32]. The Appeals Council denied the Plaintiff's request for review, thereby making the ALJ's decision the final decision of the Commissioner. [Tr. 5-7]. The Plaintiff has exhausted his available administrative remedies, and this case is now ripe for review pursuant to 42 U.S.C. § 405(g).

## II.   STANDARD OF REVIEW

The Court's review of a final decision of the Commissioner is limited to (1) whether substantial evidence supports the Commissioner's decision, see Richardson v. Perales, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971), and (2) whether the Commissioner applied the correct legal standards, Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). The Court does not review a final decision of the Commissioner de novo. Smith v. Schweiker, 795 F.2d 343, 345 (4th Cir. 1986).

The Social Security Act provides that "[t]he findings of the [Commissioner] as to any fact, if supported by substantial evidence, shall be

2

conclusive...." 42 U.S.C. § 405(g). The Fourth Circuit has defined "substantial evidence" as "more than a scintilla and [doing] more than creat[ing] a suspicion of the existence of a fact to be established. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Smith v. Heckler, 782 F.2d 1176, 1179 (4th Cir. 1986) (quoting Perales, 402 U.S. at 401, 91 S.Ct. at 1427).

The Court may not re-weigh the evidence or substitute its own judgment for that of the Commissioner, even if it disagrees with the Commissioner's decision, so long as there is substantial evidence in the record to support the final decision below. Hays, 907 F.2d at 1456; Lester v. Schweiker, 683 F.2d 838, 841 (4th Cir. 1982).

## III.    THE SEQUENTIAL EVALUATION PROCESS

In determining whether or not a claimant is disabled, the ALJ follows a five-step sequential process. 20 C.F.R. §§ 404.1520, 416.920. If the claimant's case fails at any step, the ALJ does not go any further and benefits are denied. Pass v. Chater, 65 F.3d 1200, 1203 (4th Cir. 1995).

First, if the claimant is engaged in substantial gainful activity, the application is denied regardless of the medical condition, age, education, or work experience of the applicant. 20 C.F.R. §§ 404.1520, 416.920. Second,

the claimant must show a severe impairment.  If the claimant does not show any impairment or combination thereof which significantly limits the claimant's physical or mental ability to perform work activities, then no severe impairment is shown and the claimant is not disabled.  Id.  Third, if the impairment meets or equals one of the listed impairments of Appendix 1, Subpart P, Regulation 4, the claimant is disabled regardless of age, education or work experience.  Id.  Fourth, if the impairment does not meet the criteria above but is still a severe impairment, then the ALJ reviews the claimant's residual functional capacity (RFC) and the physical and mental demands of work done in the past.  If the claimant can still perform that work, then a finding of not disabled is mandated.  Id.  Fifth, if the claimant has a severe impairment but cannot perform past relevant work, then the ALJ will consider whether the applicant's residual functional capacity, age, education, and past work experience enable the performance of other work.  If so, then the claimant is not disabled.  Id.  In this case, the ALJ's determination was made at the fifth step.

## IV.    FACTS AS STATED IN THE RECORD

The Plaintiff was born on August 18, 1957 and was 46 years old at the time of the ALJ's hearing.  [Tr. 38, 95].  The Plaintiff received a high school

equivalency degree and received additional training at Knoxville Business College for one and a half years. [Tr. 107-08]. He served in the United States Marine Corps from 1975 to 1978 and received an honorable discharge. [Tr. 42, 95]. His recent past work experience includes work as a heavy equipment mechanic. [Tr. 43, 102].

On November 3, 2001, the Plaintiff presented at the Gaston Memorial Hospital Emergency Department following a motor vehicle accident. The Plaintiff was evaluated for a right ankle fracture, an intermediate laceration on his forehead and right eyebrow area, and a head contusion. An x-ray of the right ankle showed a probable nondisplaced fracture of the medial aspect of the talus, and there was evidence of mild soft tissue swelling about the ankle. His ankle was placed in a splint, and he was provided crutches for ambulation. [Tr. 171-72].

On November 7, 2001, the Plaintiff was examined by Dr. Ranjan Maitra of Charlotte Orthopedic Specialists. Dr. Maitra observed that the Plaintiff had bilateral foot and ankle swelling with ecchymosis, with the right greater than the left, and that he had diffuse pain on palpation of the left ankle [sic]. The Plaintiff's motor, sensory, and vascular functions were intact and symmetrical bilaterally. Dr. Maitra placed the Plaintiff in a short-leg, non-weightbearing

cast and prescribed pain medication.  Dr. Maitra recommended that the Plaintiff avoid weightbearing activities.  [Tr. 158].  The Plaintiff returned two weeks later for a follow-up examination.  Dr. Maitra noted that the Plaintiff had not been compliant with non-weightbearing restrictions and had removed the cast himself.  The Plaintiff complained of pain in his right ankle.  Dr. Maitra reapplied the leg cast and again instructed the Plaintiff to avoid weightbearing activities.  [Tr. 159].

An x-ray performed on May 8, 2002 revealed mild degenerative changes in the right ankle, with small osteophytes about the medial malleolus most likely related to an old injury.  [Tr. 177].

On May 11, 2002, the Plaintiff was evaluated by Dr. Eugene Reynolds, II of Gaston Family Health Services.  The Plaintiff complained of chronic right ankle plain resulting from the fracture.  He reported that his ankle had been set in a cast on three separate occasions.  On examination, Dr. Reynolds observed crepitants of the right ankle and some slightly restricted range of motion.  He noted that the Plaintiff had minimal pain with palpation and no point tenderness or edema.  He further noted that the Plaintiff walked with an antalgic gait favoring the right leg.  Dr. Reynolds that the Plaintiff had normal range of motion except for the right ankle, that he had negative straight leg

raising, and that his motor strength was 5/5 in the upper and lower extremities with normal grip strength, normal deep tendon reflexes, and normal pulses. A sensory examination revealed no deficits. Dr. Reynolds concluded that the Plaintiff's ankle was poorly healed and likely would require either surgery or repeat cast application. [Tr. 178-80].

The Plaintiff's medical records were reviewed on May 17, 2002 by DDS consultative examiner Robert Gardner, M.D. [Tr. 130-37]. Dr. Gardner noted that the Plaintiff had complained of ankle pain and swelling. He further noted that the PLaintiff had reported that he was able to walk to the mailbox and back and that he took "a lot of BC powders" for pain. [Tr. 137]. Dr. Gardner opined that the Plaintiff was capable of lifting or carrying fifty pounds occasionally and twenty-five pounds frequently; that he could sit up to six hours during an eight-hour workday; that his ability to push and pull was unlimited; and that he had no postural, manipulative, visual, communicative or environmental limitations. [Id.]. A medical consultative review performed on August 9, 2002 by Pitt Tomlinson, M.D. confirmed Dr. Gardner's assessment. [Tr. 139].

The Plaintiff was seen by Dr. William H. Jarman, Jr. of Carolina Orthopaedic & Sports Medicine Center, P.A. for his right ankle injury. On

September 23, 2002, the Plaintiff reported to Dr. Jarman that he had a severe problem with his right ankle and that he could not work. He stated that he had tried to get disability and other aid but had been unable to do so. Although the Plaintiff reported having severe pain in his ankle, he reported that he was not taking any medication. Upon examination, Dr. Jarman noted that there was some swelling in the ankle area, and that the area was tender to palpation and manipulation. He further noted a moderate decrease in motion of the right ankle as compared to the left. Dr. Jarman provided the Plaintiff with samples of Vioxx 25 mg and gave him an equalizer brace for his ankle. [Tr. 187-88]. A CT scan of the ankle performed on October 14, 2002 showed marked cyst changes of the anterior medial dome of the talus. [Tr. 189, 192]. An x-ray performed on October 21, 2002 showed a normal width of the articular surface of the ankle. [Tr. 189].

On February 10, 2003, Dr. Jarman concluded that a fusion of the right ankle was appropriate. [Tr. 190]. Also on that date, Dr. Jarman completed a residual functional capacity assessment of the Plaintiff. In that assessment, Dr. Jarman opined that due to severe arthritis of the right ankle, the Plaintiff was unable to use force with his right ankle and foot; that he could carry ten pounds occasionally; that he could carry ten pounds frequently; that he could

stand and walk less than two hours during an eight-hour workday; that he could stoop/bend and climb stairs on an occasional basis; that he could never crouch or climb ladders; that his ability to push and pull was affected; and that he was limited in the areas of kneeling, crawling, and balancing. Dr. Jarman further opined that the Plaintiff needed the opportunity to shift from sitting or standing/walking at will, and that the Plaintiff's impairments would cause him to be absent from work more than three times per month on average. [Tr. 193-95]. Ultimately, Dr. Jarman opined that the Plaintiff was limited to sedentary work. [Tr. 196].

Dr. Jarman next saw the Plaintiff on October 14, 2003. The Plaintiff reported that he was continuing to have severe problems with his right ankle. An examination revealed that the Plaintiff had scars and erythematous patches around his ankles and that he used a cane for ambulation. Dr. Jarman noted that the Plaintiff "does not appear to be fit for work [due to his] many problems." [Tr. 190].

The Plaintiff returned to see Dr. Maitra on March 29, 2004 for reevaluation of his ankle pain. Dr. Maitra noted that the Plaintiff had pain to palpation over the medial gutter, and that his right ankle showed mild soft tissue swelling over the lateral and medial gutters. Dr. Maitra noted that the

Plaintiff was able to do a heel raise independently on his right leg without difficulty, and that his motor, sensory, and vascular examinations were all normal without deficit. Radiographs of the right foot taken while standing showed normal midfoot and forefoot bony alignment. X-rays of the right ankle revealed some medial and lateral gutter osteophytes and anterior tibial talar osteophytes. Dr. Maitra reviewed the CT scan taken in October 2002, which revealed significant degenerative talar cystic changes and mild tibiotalar degenerative changes, as well as the presence of small ostechondral bodies. Dr. Maitra concluded that the Plaintiff suffered from posttraumatic arthritis of the right ankle. Dr. Maitra did not believe that the Plaintiff was indicated for an ankle fusion but instead recommended an intraarticular cortisone injection to the ankle or an arthroscopy of the ankle for debridement of the medial and lateral gutter osteophytes as well as the anterior tibiotalar spurs to try to increase his range of motion and decrease joint irritation. Dr. Maitra concluded that the Plaintiff could be gainfully employed but recommended a seated position due to his right ankle injury and symptoms. [Tr. 210-11].

The Plaintiff received a neurological evaluation from Dr. Jeffery Ewert of Carolina NeuroServices on March 30, 2004. [Tr. 198-204]. The Plaintiff reported to Dr. Ewert that he first sustained a closed head injury in a

motorcycle accident in 1981, and that he had been unconscious for three days thereafter. The Plaintiff also reported having three concussions, with the most recent being in November 2001 as a result of his motor vehicle accident. The Plaintiff complained of double vision and problems with making decisions; specifically, he reported that he was often impulsive and made poor decisions with his credit card. He also reported that he angered easily and that he exhibited mood swings. [Tr. 198]. Dr. Ewert noted that the Plaintiff had evidence of cognitive impairment, primarily affecting his visual sustained attention and ability to learn new visual information, and significant impairment in executive functions, primarily affecting his problem-solving abilities and verbal fluency. Dr. Ewert noted, however, that the Plaintiff showed areas of significant cognitive preservation, including simple and sustained attention, verbal memory, visual perceptual, and a majority of language and academic skills. He noted that the Plaintiff's intellectual abilities were in the average range of functioning, as were the majority of his language skills. [Tr. 203].

Dr. Ewert found that the Plaintiff showed evidence of significant psychological maladjustment and significant problems with irritability and anger control. He further noted that the Plaintiff had great difficulty with authority figures and was likely to reject authority in a work-related situation;

that he was impulsive and had very poor decision making skills; and that he tended to over-utilize denial and repression. Dr. Ewert recommended that the Plaintiff be considered for disability due to his psychological and emotional problems. Dr. Ewert opined that it was unlikely that the Plaintiff would be able to maintain employment due to his significant problems with decision making, impulse control, difficulty with authority figures, and explosive behavior. Dr. Ewert also suggested that the Plaintiff might benefit from an antidepressant medication, such as Zoloft. [Tr. 203-04].

The Plaintiff was seen by Dr. Larry Berman on March 30, 2004. The Plaintiff presented with multiple complaints, including a right foot injury, blurred vision, double vision, carpal tunnel injury to the left hand, shoulder decompression to the left shoulder, and left elbow injury. The Plaintiff also reported that he suffered from posttraumatic stress disorder. A review of his systems revealed no evidence of any problems or changes with his eyes; his pupils and irises were reactive to light and accommodation, and his conjunctivae and lids were normal. Dr. Berman noted that the Plaintiff had extreme difficulty in ambulation, mostly in the ankle area and could walk only a short distance without taking a break. The Plaintiff walked with a cane in his right hand. On psychiatric examination, the Plaintiff was alert and oriented to

person, place, and time, and there was no evidence of any change in his judgment or memory. Dr. Berman diagnosed the Plaintiff with posttraumatic stress disorder, blurry vision, and chronic disability due to an ambulatory impairment. [Tr. 205-06].

At the ALJ's hearing, the Plaintiff testified that he has pain daily in his right ankle and leg, and that movement will increase this pain. He testified that there is nothing he can do to make the pain go away completely, although he reported that he takes arthritis medication, which eases the pain a little bit. [Tr. 50].

The Plaintiff testified that he underwent surgery for carpal tunnel syndrome in his left wrist during the 1980's, and that he continues to have pain in this area. He reported that the pain increases in cold weather. [Tr. 50-51]. The Plaintiff had two surgeries on his left elbow in the late 1990's and continues to have pain in that area if he bangs his elbow on something. [Tr. 52]. The Plaintiff had surgery on his left shoulder in 1995 or 1996, and he stated that he experiences pain in this area when he lifts something sideways. [Tr. 52-53]. The Plaintiff testified that he has trouble remembering things and that he has poor vision. [Tr. 61]. He reported that he often has double vision which is not helped by wearing glasses. [Tr. 62].

With respect to activities of daily living, the Plaintiff testified that he uses a cane to walk. [Tr. 54]. The Plaintiff estimated that he could walk approximately fifty feet before experiencing burning pain. [Tr. 56-57]. He stated that it is painful to stand after two minutes. He reported that he can shower or bathe without assistance, but that it is difficult. He stated that his live-in girlfriend performs all of the household chores, as it is "difficult for [him] to even walk to the bathroom." [Tr. 45]. The Plaintiff stated that he has no hobbies, and that he can hardly read due to his bad vision. [Tr. 46]. He further stated that he cannot climb a ladder, nor can he go up or down stairs without pain. [Tr. 57-58].

The Plaintiff testified that he cannot sleep more than two or three hours per night because of pain. [Tr. 54]. He reported that he usually wakes up at 2:00 or 3:00 in the morning and spends the entire day on the couch watching television. [Tr. 48-49]. The Plaintiff testified that while on the couch, he keeps his ankle elevated in order to reduce the pain. [Tr. 58-59].

The Plaintiff testified that he attends church sometimes and is able to drive, although driving hurts his foot. [Tr. 45]. He reported that he is able to perform some yard work, as he can use the riding lawnmower to mow the yard. [Tr. 46-47]. He further stated that he sometimes goes with his girlfriend

to the grocery store and is able to walk through the store holding onto the grocery cart.  [Tr. 46, 56].

At the hearing, the ALJ posed the following hypothetical question to the vocational expert (VE):

> [A]ssume that I find, on the basis of the credible record before me for the full relevant period, that the [Plaintiff's] demonstrated exertional impairments reflected on his residual functional capacity for light range of sedentary work.  Assume further that he has certain non-exertion[al] impairments principally relating to the fracture of the right ankle, and assume that that condition would preclude one from performing work which entailed prolonged standing and walking.  There would be no climbing of ladders or scaffolds; there would be no balancing; no use of foot controls on the right; no crouching, crawling, or kneeling.  Taking into account those limitations, would there be jobs one could do with those restrictions?

[Tr. 68].  The VE responded in the affirmative, identifying the following occupations: surveillance system monitor (approximately 1,200 in North Carolina and 70,000 nationally); maintenance service dispatcher (approximately 1,770 jobs in North Carolina and 80,000 nationally); and ink printer (approximately 600 jobs in North Carolina and 30,000 nationally).  [Tr. 68-69].  Upon further questioning, the VE testified that the use of a cane to ambulate would not affect the Plaintiff's ability to perform the jobs that she described.  The VE further testified that depending upon the set up of the

particular machines in use, the ink printer position may not be able to accommodate an individual's need to elevate his leg.  [Tr. 69].

The ALJ then asked the VE if a hypothetical individual could perform these jobs if the individual was limited to the physical restrictions already identified as well as limited to performing unskilled work in a low-stress environment.  [Tr. 70].  The VE responded that the ink printer and surveillance system monitor positions would qualify as unskilled, low-stress positions.  [Tr. 7071].  The VE further testified that with these limitations, the individual also could work as a masker (approximately 500 jobs in North Carolina and 18,000 nationally); cuff folder (approximately 450 jobs in North Carolina and 20,000 nationally); and carding-machine operator (approximately 400 jobs in North Carolina and 10,000 nationally).  [Tr. 71].  When asked upon cross-examination whether the jobs identified would accommodate the need to sit or stand/walk at will, the VE testified as follows:

> Q   Would the jobs that you've identified accommodate the opportunity to shift at will from standing or sitting position?  Or do they require the person to be sitting the entire time?
>
> A   Surveillance system monitor would allow the person to stand if they continued to be at their work station, and be able to look at the monitor. They couldn't walk away or leave their work station, because they wouldn't be able to watch

the monitor if they did that. The other jobs would, let me go over, I mentioned so many.

BY ADMINISTRATIVE LAW JUDGE:

Q     Well, forget about dispatcher and ink.

A     Yeah, okay. Forget about what?

Q     Forget about the jobs of dispatcher and ink --

A     Oh, okay. All right. The jobs are normally done seated. I think if a person needed to take a very brief standing break, that they would be able to do that. But they would not be able to take a prolonged break at any time.

BY ATTORNEY:

Q     All right. So as I posed the question, they would not be able to do the job if they had to, be able to do this at will?

A     Well, it would be dependent on how many times they'd have to do it at will during the day. If it was just once, it shouldn't be a problem.

BY ADMINISTRATIVE LAW JUDGE:

Q     Are we talking about masker and cuff folder and carding-machine operator, or are we talking about surveillance system monitor, or all four of them?

A     I don't know . You can try to [INAUDIBLE].

BY ATTORNEY:

Q   I'm specifically asking about the jobs that you've identified.

A   Okay.

ALJ:  Well, these four.

VE:  Okay.

ALJ:  Okay.

VE:  As I said, the person could take a brief standing break, but not prolonged and not often at will.

[Tr. 73-74].

## V.   THE ALJ'S DECISION

On April 29, 2004, the ALJ issued a decision denying the Plaintiff's claim.  [Tr. 21-32].  Using the five-step sequential evaluation process promulgated by the Social Security Administration, see 20 C.F.R. §§ 404.1520, 416.920, the ALJ made the following findings.  At step one, the ALJ found that the Plaintiff has not engaged in substantial gainful activity since his alleged onset date.  [Tr. 25].  At step two, the ALJ found that the Plaintiff's fractured right ankle and cognitive disorder are "severe" medically determinable impairments within the meaning of 20 C.F.R. §§404.1521 and 416.921.  [Tr. 27].  At step three, the ALJ concluded that none of the Plaintiff's impairments, either in singly or in combination, meet or medically equal the

criteria of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. [Tr. 27-28].

Next, the ALJ addressed the issue of the Plaintiff's credibility. Based on his review of the medical evidence of record, as well as the subjective evidence regarding the Plaintiff's limitations and his activities of daily living, the ALJ was not persuaded that the Plaintiff's impairments precluded all work activity. Specifically, the ALJ noted that Dr. Reynolds found in May 2002 that Plaintiff's straight leg raising was negative, that his extremity motor strength was rated as five out of five, that his grip strength and pulses were normal, that he had no sensory deficits, and that his range of motion was normal except for his right ankle. [Tr. 28]. The ALJ then noted that the Plaintiff's September 2002 ankle X-ray demonstrated that his articular surface was close to normal width. [Tr. 28-29]. The ALJ also noted that Dr. Maitra's March 2004 examination revealed that Plaintiff only had mild soft tissue swelling in his right ankle and that he was able to heel raise independently on his right leg without difficulty. [Tr. 29]. The ALJ further noted that Dr. Maitra concluded that Plaintiff could be gainfully employed in a job requiring a seated position. [Id.].

The ALJ then assessed the Plaintiff's cognitive impairments and concluded that his condition was not as severe as he alleged. Specifically, the ALJ noted that while Dr. Ewert found evidence of a significant impairment in his executive functions, primarily problem solving and verbal fluency, the doctor also concluded that the Plaintiff's intellectual abilities and language skills were in the average range of functioning, and that he demonstrated areas of significant cognitive preservation. The ALJ further considered Plaintiff's contentions regarding his vision problems and found that prior to March 2004 there was no evidence that he had complained of any vision difficulties to his physicians. The ALJ thus concluded that the Plaintiff's vision problems do not constitute a severe impairment. [Id.].

Further, the ALJ found that Plaintiff's testimony as to the intensity and limiting effects of his symptoms was not persuasive in light of his daily activities. Specifically, the ALJ noted that while the Plaintiff testified that walking and movement increased his pain, he also reported that he walked to the mailbox and back and went grocery shopping with his girlfriend. The ALJ further noted that although Plaintiff stated that he was experiencing severe pain in his ankle, according to Dr. Jarman's September 2002 treatment notes, he was not taking any medication. The ALJ added that the Plaintiff

reported that he was only taking BC powder for his pain. [Tr. 29]. For these reasons, the ALJ concluded that the Plaintiff's allegations regarding his limitations were not totally credible. [Tr. 31].

Proceeding to step four, the ALJ determined that the Plaintiff could not return to his past relevant work or perform semi-skilled sedentary work. The ALJ concluded, however, that the Plaintiff retained the residual functional capacity to perform sedentary work with the following restrictions: no prolonged walking or standing, no climbing, balancing or use of foot controls on the right, and no crouching, crawling or kneeling. Additionally, the ALJ determined that the Plaintiff is limited to unskilled, simple routine repetitive tasks and work that would allow the elevation of his leg up to 18 inches from time to time. [Tr. 29].

In reaching this conclusion, the ALJ relied heavily upon the opinions of the DDS medical consultants as well as the opinion of the Plaintiff's treating physician, Dr. Jarman. The ALJ explicitly stated that he had "given more weight to [Dr. Jarman's] opinion," as Dr. Jarman had "first-hand knowledge of the claimant's condition." [Tr. 29]. Specifically, the ALJ noted there was no persuasive evidence in the record contrary to Dr. Jarman's opinion, and that his medical opinion was supported by his treatment notes, radiology reports,

and the Plaintiff's description of his pain and functional limitations.  The ALJ also noted that Dr. Jarman's opinion was consistent with the opinion of Dr. Maitra, another treating physician, who had opined that the Plaintiff could be gainfully employed but recommended that he "obtain a seated position" due to his physical limitations.  [Tr. 30].

The ALJ further noted as follows:

> [The VE] responded to a hypothetical question which assumed the existence of an individual with a residual functional capacity for sedentary work on a sustained basis, with the exertional and nonexertional impairments outlined above.  Based on the hypothetical question, the vocational expert testified that the following sedentary, unskilled jobs could be performed with these restrictions: maintenance dispatcher (1,770 in North Carolina and 80,000 in the national economy) and ink printer (600 in North Carolina and 30,000 in the national economy).  Upon further questioning, the vocational expert testified that the use of a cane would not impact on these sedentary jobs and that one could elevate the leg up to 18 inches from time to time without problems.  The undersigned notes that the vocational expert's testimony is consistent with the descriptions of these jobs in the <u>Dictionary of Occupational Titles</u>.

[Tr. 30].  Based on the foregoing, the ALJ concluded that there are a significant number of sedentary jobs in the national economy that the Plaintiff can perform, and therefore, the Plaintiff is not "disabled" within the meaning of the Social Security Act.  [Tr. 31].

## VI.   DISCUSSION

On appeal, the Plaintiff raises six assignments of error.  Specifically, he argues: (1) that the ALJ erred in failing to give proper weight to the opinions of the Plaintiff's treating physicians; (2) that the ALJ erred in assessing the Plaintiff's credibility; (3) that the ALJ erred in failing to apply the technique as required in 20 C.F.R. § 404.1520a; (4) that the ALJ erred in finding the testimony of the VE was consistent with the <u>Dictionary of Occupational Titles</u> (4th ed. 1991); (5) that the ALJ erred in failing to include a sit/stand option in his RFC assessment and the hypothetical question to the VE; and (6) that the ALJ erred in failing to inquire as to why the Plaintiff did not take prescribed medication and was taking over-the-counter pain relievers.  [Doc. 19 at 1-2]. For the reasons that follow, the Court agrees with the Plaintiff that the ALJ's failure to provide an adequate explanation for his rejection of certain opinions of the Plaintiff's treating physician as well as certain inconsistencies in the VE's testimony warrant remand of this case for further proceedings.

### A.    Dr. Jarman's Opinions

In reaching the conclusion that the Plaintiff is capable of performing sedentary work, the ALJ relied heavily on the opinion of the Plaintiff's treating physician, Dr. Jarman.  On February 10, 2003, Dr. Jarman completed a

residual functional capacity assessment of the Plaintiff and made the following findings: that the Plaintiff was unable to use force with his right ankle and foot; that he could carry ten pounds occasionally; that he could carry ten pounds frequently; that he could stand and walk less than two hours during an eight-hour workday; that he could stoop/bend and climb stairs on an occasional basis; that he could never crouch or climb ladders; that his ability to push and pull was affected; and that he was limited in the areas of kneeling, crawling, and balancing. [Tr. 193-96]. These limitations are reflected in the ALJ's RFC determination and in his hypothetical to the VE. [See Tr. 29-31]. Dr. Jarman also opined, however, that the Plaintiff needed the opportunity to shift from sitting or standing/walking at will, and that the Plaintiff's impairments would cause him to be absent from work more than three days per month on average. [Tr. 193-96]. Further, in October 2003, Dr. Jarman opined that the Plaintiff did "not appear to be fit for work" due to his many physical problems. [Tr. 190]. The ALJ did not incorporate these opinions of Dr. Jarman in his RFC assessment, nor did he explain why such opinions were rejected. The ALJ's failure to address these particular opinions was error.

A treating physician's opinion regarding the nature and severity of a claimed impairment is entitled to controlling weight where such opinion is

"well-supported by medically acceptable clinical and laboratory diagnostic techniques" and "is not inconsistent with the other substantial evidence in the case record."  Social Security Ruling (SSR) 96-2p.  In the present case, the ALJ gave "great weight" to Dr. Jarman's opinion, finding that there was no persuasive contradictory evidence in the record and that his medical opinion was well-supported by his treatment notes, radiology reports, and the Plaintiff's description of his pain and functional limitations.  [Tr. 30].  Yet, the ALJ did not adopt Dr. Jarman's conclusions that the Plaintiff needed the opportunity to sit or stand/walk at will, nor did he address Dr. Jarman's conclusions that the Plaintiff's impairments would result in him missing more than three days of work per month and that the Plaintiff did not appear to be "fit for work."  The ALJ was required to provide a specific explanation for why he rejected these opinions of the Plaintiff's treating physician.  See DeLoatche v. Heckler, 715 F.2d 148, 150 (4th Cir. 1983) (remanding for further consideration where ALJ "failed to explain why he disregarded the positive opinion expressed by [the claimant's] treating physicians that she is totally disabled"); Stroup v. Apfel, No. 96-1722, 2000 WL 216620, at *6 (4th Cir. Feb. 24, 2000) (remanding for new hearing where the ALJ did not explain

adequately why the reports of the consultative physicians were a sufficient basis for rejecting treating physician's opinion).

The Defendant argues that the ALJ's failure to adopt Dr. Jarman's sit/stand limitation was not error because such a finding is not necessarily inconsistent with a determination that the claimant can perform sedentary work. While it is true that a limitation that requires an individual to have the ability to sit or stand at will does not necessarily preclude all sedentary work, the Social Security Administration has recognized that such a requirement may severely restrict the types of sedentary work available to the claimant:

> An individual may need to alternate the required sitting of sedentary work by standing (and, possibly, walking) periodically. Where this need cannot be accommodated by scheduled breaks and a lunch period, *the occupational base for a full range of unskilled sedentary work will be eroded.* The extent of the erosion will depend on the facts in the case record, such as the frequency of the need to alternate sitting and standing and the length of time needed to stand. The RFC assessment must be specific as to the frequency of the individual's need to alternate sitting and standing. It may be especially useful in these situations to consult a vocational resource in order to determine whether the individual is able to make an adjustment to other work.

SSR 96-9p (emphasis added). Further, because "[u]nskilled types of jobs are particularly structured so that a person cannot ordinarily sit or stand at will,"

the use of a vocational specialist is needed "to clarify the implications for the occupational base." SSR 83-12.

In the present case, the ALJ, relying upon the testimony of the VE, identified two positions that the Plaintiff could perform in the national economy: maintenance dispatcher and ink printer. [Tr. 30]. The maintenance dispatcher position identified by the VE, however, is a semi-skilled position and therefore does not meet the restrictions set out in the ALJ's residual functional capacity determination or hypothetical. The Defendant concedes error on this point. [Doc. 21 at 20-21]. Further, while the VE testified that the ink printer position was an unskilled, sedentary position, she testified that this position would not likely accommodate the Plaintiff's need to elevate his leg from time to time. [Tr. 69]. As such, the ink printer position identified by the VE does not meet the restrictions set out in the ALJ's residual functional capacity determination either.

While the VE identified four other positions which the Plaintiff was capable of performing, the ALJ did not reference these positions in his findings, and therefore, the Court is not able to determine from this record whether the ALJ considered these positions to satisfy the restrictions set out in the residual functional capacity assessment. In any event, the Defendant

concedes that the surveillance system monitor position identified by the VE is not sufficient to carry the Defendant's burden at Step Five. [Doc. 21 at 20-21]. With respect to the other positions identified -- masker, cuff folder, and carding-machine operator -- the record is unclear as to whether these positions would accommodate the Plaintiff's need to sit or stand/walk at will. As the VE noted, these positions normally are performed seated and do not often permit for standing or walking at will. The VE testified that whether the Plaintiff's need to sit or stand/walk can be accommodated by these positions depends on the number of times that the Plaintiff would require to stand or walk in a given day. [Tr. 74]. As the ALJ did not develop the record on this issue, the Court is unable to determine whether these positions would accommodate this limitation.

The Defendant further argues that the ALJ's failure to adopt Dr. Jarman's other opinions was not error because Dr. Jarman failed to reference any objective evidence in support of these opinions and because these opinions are inconsistent with the other opinions of record regarding the Plaintiff's ability to work, including Dr. Jarman's own conclusion that the Plaintiff is capable of performing sedentary work. [Doc. 21 at 5]. It may well be that the ALJ determined that Dr. Jarman's opinions regarding the likelihood

of absences and the Plaintiff's fitness for work were inconsistent with other substantial evidence in the record or were not supported by sufficient clinical findings. The ALJ, however, did not make any specific findings in this regard; to the contrary, the ALJ appeared to endorse Dr. Jarman's opinion in its entirety, finding there was no persuasive evidence in the record to contradict his findings and that his medical opinion was well-supported by his treatment notes, radiology reports, and the Plaintiff's description of his pain and functional limitations. [Tr. 30]. This inconsistency in the evaluation of Dr. Jarman's opinions must be addressed on remand. If the ALJ determines that all of Dr. Jarman's opinions are entitled to controlling weight, then these additional opinions should be considered by the ALJ in assessing the Plaintiff's residual functional capacity. If the ALJ chooses not to accept all of Dr. Jarman's opinions and to incorporate the additional limitations identified by Dr. Jarman into the RFC assessment, the ALJ must develop the record adequately and explain why these opinions should be rejected.

## B. Other Issues Raised by the Plaintiff on Appeal

Although the Court already has determined that this case should be remanded for a new hearing, the Court nevertheless will address the other issues raised by the Plaintiff on appeal.

The Plaintiff argues that the ALJ improperly disregarded the opinion of Dr. Ewert. [Doc. 19 at 11]. The ALJ's evaluation of Dr. Ewert's opinion, however, was consistent with the relevant regulations and rulings. First, to the extent that Dr. Ewert opined that the Plaintiff was unable to work due to his psychological and emotional problems, this opinion concerns an issue expressly reserved to the Commissioner and thus was thus not entitled to any significant weight. 20 C.F.R. § 404.1527(e); SSR 96-5p. Furthermore, the ALJ concluded that Dr. Ewert's assessment was not supported by his own examination findings, and that it conflicted with the findings of the Plaintiff's other physicians. [Tr. 26-27, 30]. Thus, the ALJ's decision to reject Dr. Ewert's opinion was supported by substantial evidence.

The Plaintiff also argues that the ALJ erred in failing to follow the directives in SSR 02-1p in assessing the Plaintiff's impairments. [Doc. 19 at 11]. Social Security Ruling 02-1p, however, is not applicable to this case because the Plaintiff has not alleged that he suffers from obesity. See SSR 02-1p (providing "guidance on Social Security Administration policy concerning the evaluation of obesity in disability claims"). Accordingly, this argument is without merit.

Next, the Plaintiff argues that the ALJ's credibility determination was deficient because the ALJ failed to identify the evidence that supported his decision and because the ALJ failed to investigate all the "possible reasons" why the Plaintiff did not take prescription medication for his pain. [Doc. 19 at 12, 21].

Contrary to the Plaintiff's argument, the ALJ did identify the evidence that he considered in evaluating Plaintiff's credibility. [See Tr. 28-29]. Specifically, the ALJ noted the Plaintiff's testimony regarding his activities of daily living, his limitations, and his subjective complaints of pain. [Tr. 28]. The ALJ also noted the medical evidence in the record that supported his credibility determination, including the findings from Plaintiff's treating and examining physicians. [Tr. 25-27]. Further, the ALJ provided a rationale for his negative credibility finding. The ALJ concluded that the Plaintiff's subjective complaints were not totally credible because his physical complaints were not consistent with the medical evidence from Dr. Reynolds and Dr. Maitra, his cognitive allegations were not corroborated by Dr. Ewert's examination findings, and his claimed vision problems were not supported by Dr. Berman's report or the findings from any other treating or examining physician. [Tr. 28-29]. The ALJ specifically noted that the Plaintiff's testimony

as to the intensity and limiting effects of his symptoms was inconsistent with his statements regarding his activities of daily living, including walking to the mailbox and mowing the lawn. [Tr. 29].

The Court agrees with the Plaintiff, however, that the ALJ's consideration of the Plaintiff's use of over-the-counter medication was not consistent with controlling case law. In assessing the Plaintiff's credibility, the ALJ considered the fact that the Plaintiff reported in his disability application that he took BC powder, a non-prescription pain reliever, for pain. [Tr. 123]. This fact was also noted by Dr. Gardner in his consultative examination. [Tr. 137]. The Plaintiff's statement regarding his use of over-the-counter medication must be evaluated in the proper context. In that same disability application, the Plaintiff explained that he did not take any prescription medications because he could not afford them. [Tr. 123]. "[A] claimant's failure to obtain medical treatment that [he] cannot afford cannot justify an inference that [his] condition was not as serious as [he] alleges . . . ." Mickles v. Shalala, 29 F.3d 918, 930 (4th Cir. 1994). Only when there is an "unexplained inconsistency between the claimant's characterization of the severity of [his] condition and the treatment [he] sought to alleviate that condition" is such information probative of the claimant's credibility. Id. On

remand, the ALJ should assess the Plaintiff's credibility without reference to his inability to obtain prescription medications.

Next, the Plaintiff claims that the ALJ erred in his evaluation of the Plaintiff's mental impairments. [Doc. 19 at 15-17]. In evaluating the mental impairments of a claimant, the Administration follows a special technique at each stage of the review process. 20 C.F.R. § 404.1520a. First, the Administration must evaluate the pertinent symptoms and laboratory findings to determine whether the claimant has a medically determinable mental impairment. 20 C.F.R. § 404.1520a(b)(1). Then, the Administration must rate the degree of functional limitation arising from the impairment, specifically considering the claimant's activities of daily living, social functioning, concentration, persistence or pace and episodes of decompensation. 20 C.F.R. § 404.1520a(c)(2), (3). After the functional areas are rated, the Administration must determine the severity of the claimant's mental impairment. 20 C.F.R. § 404.1520a(d).

The ALJ properly evaluated the Plaintiff's mental impairments in this case. The ALJ found that the Plaintiff has mild limitations in his activities of daily living and social functioning, moderate restrictions in his concentration, persistence and pace, and no extended episodes of decompensation. [Tr.

30].  Based on this review, the ALJ concluded that the Plaintiff's cognitive disorder is a severe impairment.  [Tr. 27].  While the Plaintiff argues that the ALJ's analysis of his mental impairments failed to consider the entire record [Doc. 19 at 16], the Plaintiff has failed to identify any evidence that the ALJ failed to consider in his decision.  Additionally, the Plaintiff does not contend that he suffers from a mental impairment that the ALJ failed to identify or evaluate, nor does he object to the ALJ's ultimate Step Two determination that the Plaintiff's cognitive disorder is a severe impairment.  As such, the Plaintiff has failed to demonstrate that the ALJ's evaluation of his mental impairment is not supported by substantial evidence.

## V.    CONCLUSION

For the reasons stated herein, the Court that this case should be remanded for a new hearing.


## O R D E R

Accordingly, **IT IS, THEREFORE, ORDERED** that the Plaintiff's Motion for Summary Judgment [Doc. 18] is **GRANTED** to the extent that the Plaintiff seeks reversal of the Commissioner's decision denying him disability benefits.

To the extent that the Plaintiff seeks an immediate award of benefits, the Plaintiff's Motion [Doc. 18] is **DENIED**.

Pursuant to the power of this Court to enter a judgment affirming, modifying or reversing the decision of the Commissioner under Sentence Four of 42 U.S.C. § 405(g), the decision of the Commissioner is **REVERSED**, and this case is hereby **REMANDED** to the Commissioner for further administrative action consistent herewith.

**IT IS FURTHER ORDERED** that the Defendant's Motion for Summary Judgment [Doc. 20] is **DENIED.**

A judgment shall be entered simultaneously herewith.

**IT IS SO ORDERED.**

Signed: April 21, 2009

Martin Reidinger
United States District Judge